**Application of William L. GOFFE.**

**Patent Appeal No. 75–621.**

United States Court of Customs and Patent Appeals.

Oct. 7, 1976.

George J. Cannon, Xerox Corp., Patent Dept., Rochester, New York, atty. of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

MILLER, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board

of Appeals affirming the rejection of claims 1–28 and 31–33 in application serial No. 755,306, filed August 26, 1968, for "Imaging System." We reverse.

### The Invention

Appellant's invention is illustrated by Figure 1:

*FIG. 1*

An image is formed on an imaging member 10 comprising substrate 11, softenable layer 12, and agglomerable layer 13. The particles of layer 13 are agglomerated (fused together into a smaller number of larger spheres of less total surface area) imagewise by localized application of solvent or heat. This renders the selected areas more transparent than the remaining area.

Claim 1, the only independent claim, is set forth with disputed portions in italics:

    1. An imaging method comprising the steps of:

    (a) providing an imaging member comprising a *non-gaseous agglomerable* layer *contacting* a softenable layer, said softenable layer or said agglomerable layer capable of being softened pursuant to the imagewise softening step below; and

    (b) imagewise softening said softenable layer or said agglomerable layer or both to cause agglomeration of non-gaseous portions of said agglomerable layer in said imagewise softened areas of said member whereby said member in said imagewise softened areas is made more transparent compared to non-imagewise softened areas of said member.

### The Rejections

The board affirmed the rejection of claims 1–10, 14–16, 20–23, and 26–28 under 35 U.S.C. § 112, first paragraph, on the basis that the disclosure in appellant's specification is not commensurate in scope with the claims—more particularly, with the word "agglomerable" in the phrase "non-gaseous agglomerable layer" which appears in the claims. It said:

> The claims merely recite an effect, and the specification does not adequately instruct one skilled in the art how to determine the scope of materials which may be capable of producing the desired effect (agglomerate) under the conditions of the claimed method (i. e., by imagewise softening). For example, there is no indication that there is any relationship between the capacity to agglomerate and any property (chemical or physical) of the material to be selected. The limited disclosure of selenium compositions, sulfur and "dyed" polyvinylcarbazole does not, nor is it asserted to, define any known type or class of material from which the skilled chemist would be able to ascertain other substances with like or analogous agglomeration properties. Further, as pointed out by the examiner, there appears to be some doubt as to the exact nature of the process which is responsible for causing the agglomeration; therefore, the skilled worker would have no guide as to the type of materials which might be applicable in the process other than those specifically disclosed. The scope of the materials intended to be covered by the claims cannot, therefore, be determined by reference to the specification but only through *undue* experimentation . . .

> . . . If "agglomerable" is to be given its ordinary dictionary meaning as urged [by appellant] . . . , then the claims would read on any liquid or solid (liquefiable under the reaction conditions) since all liquids tend to agglomerate (e. g., water, mercury, oils, etc.). Accordingly, the disclosure is not commensurate in scope with that which is contemplated by the claim language.

The board also affirmed the rejection of claims 1–13, 17–26, and 31–33 under 35 U.S.C. § 112, first paragraph, for failing to define the agglomerable layer as *embedded*

within the softenable layer. It adopted the examiner's reasoning that the specification requires that the softenable layer be such that it can be rendered more permeable to the agglomerable layer migrating substantially laterally through its bulk and that this migration could only occur when the agglomerable layer is at least partially embedded in the softenable layer. It concluded, therefore, that the claims read on a configuration not intended to be included within the concept described in the specification.

## OPINION

### Sufficiency of disclosure re "non-gaseous agglomerable layer"

■ On the record before us, we are persuaded that appellant's disclosure provides sufficient guidance for one skilled in the art to practice the invention as claimed without undue experimentation.[1] No question is raised over the fact that appellant's disclosure is "enabling" insofar as no experimentation is required to enable one of ordinary skill in the art to practice the invention as disclosed. The PTO's objection is simply that undue experimentation would be required to determine "suitable agglomerable materials," other than those specifically disclosed. There is no suggestion that the area of technology is particularly complex or unpredictable. See In re Coleman, 472 F.2d 1062, 1064 (Cust. & Pat.App.1973). We note that the claims are to a process and that there are nine specific examples.

Moreover, the manner in which the agglomerable layer operates is explained:

Agglomerate and the several variant forms thereof used herein defines the effect of substantial massing or fusing together of the imagewise softened portions of layer 13 to greatly reduce the cross-sectional area and transparentize or effect a color change of layer 13 in said areas, the color change associated with the light scattering caused, for example, by the particles in the imaged areas of a particle layer 13 . . . , which may be accompanied by some dispersing of individual portions or particles of layer 13 in depth in layer 12 which produce additional transparentizing and color changes; specifically including the massing together of closely packed particles into a smaller number of larger spheres of less total surface area.

Optimum,[2] preferred,[3] and "suitable"[4] examples of agglomerable materials are set forth, and they indicate that there is a wide latitude in the choice of materials that can be used. See In re Goffe, 526 F.2d 1393 (Cust. & Pat.App.1975). The properties of preferred agglomerable materials are also disclosed: a low glass transition temperature.[5] i. e. generally below about 50° and 60°C, and a high absorption coefficient in the visible spectrum.

The board suggests that the claims "would read on any liquid or solid (liquefiable under the reaction conditions) since all liquids tend to agglomerate (e. g., water, mercury, oils, etc.)." However, we disposed

---

1. Appellant makes the argument, inter alia, that there is no statement in his disclosure that has been questioned by the PTO and that the accuracy of statements in the disclosure is the PTO's only relevant concern; therefore, the rejection should be reversed, citing In re Marzocchi, 439 F.2d 220, 58 CCPA 1069 (1971). However, Marzocchi involved the issue of the truth of the disclosure in the specification—not the issue of "undue experimentation." In re Scarbrough, 500 F.2d 560 (Cust. & Pat.App.1974).

2. Predominantly (greater than 50% by weight) amorphous selenium "of an average particle size preferably between about 0.1 and about 0.5 microns."

3. Crystalline selenium, amorphous selenium, amorphous selenium alloyed with arsenic, tellurium, antimony, bismuth; amorphous selenium or its alloys doped with halogens; tellurium and mixtures of amorphous selenium and one or more crystalline forms of selenium including the monoclinic and hexagonal forms.

4. "Any suitable agglomerable material may be used . . . sulfur, dyed polyvinyl carbazole and others."

5. The glass transition temperature is that at which an amorphous material changes from a brittle to a plastic state. Condensed Chemical Dictionary 418 (8th ed. 1971).

of a similar argument in *In re Geerdes*, 491 F.2d 1260, 1265 (Cust. & Pat.App.1974), thus:

> [W]e cannot agree with the board's determination that the claims are inclusive of materials which would not apparently be operative in the claimed process. . . Having stated the objective . . . together with the process steps, use of materials which might prevent achievement of the objective . . . can hardly be said to be within the scope of the claims.

For all practical purposes, the board would limit appellant to claims involving the specific materials disclosed in the examples, so that a competitor seeking to avoid infringing the claims would merely have to follow the disclosure in the subsequently-issued patent to find a substitute. However, to provide effective incentives, claims must adequately protect inventors. To demand that the first to disclose shall limit his claims to what he has found will work or to materials which meet the guidelines specified for "preferred" materials in a process such as the one herein involved would not serve the constitutional purpose of promoting progress in the useful arts.[6] See *In re Fuetterer*, 319 F.2d 259, 265, 50 CCPA 1453, 1462 (1963).

Accordingly, we hold that the rejection of claims 1–10, 14–16, 20–23, and 26–28 under 35 U.S.C. § 112, first paragraph, was erroneous.

*Sufficiency of disclosure re "contacting"*

The PTO position is that the definition of the softenable layer, quoted below from the specification, is such that at least partial embedment of the agglomerable layer is critical and that the phrase "agglomerable layer contacting a softenable layer" in the claims omits this critical feature.

> "Softenable" as used herein to describe layer 12 is intended to mean any material which *can* be rendered more permeable to material or particles of layer 13 migrating substantially laterally through the bulk of layer 12. [Emphasis added.]

In determining whether an unclaimed feature is critical, the entire disclosure must be considered. Broad language in the disclosure (including the abstract) omitting an allegedly critical feature tends to rebut the argument of criticality. *In re Anderson*, 471 F.2d 1237 (Cust. & Pat.App. 1973). Also, features that are merely preferred are not critical. *In re Armbruster*, 512 F.2d 676 (Cust. & Pat.App.1975); *In re Geerdes, supra.*

The above-quoted definition concerns only a property of the softenable layer and does not recite that the agglomerable material *must* migrate through layer 12. The abstract uses the broad term "contacting." The specification describes embedment of layer 13 in layer 12 as "preferred." It recites that agglomeration "*may* be accompanied by some dispersing of individual portions or particles of layer 13 in depth in layer 12 which produce additional transparentizing and color changes . . . ." (Emphasis added.) The disclosure of how to make the agglomerable layer tends to show that it may rest entirely on the surface of the softenable layer. Thus, after describing the formation of the agglomerable layer by vacuum evaporation, cascading, or dusting, the specification discloses that "[i]f thicker coatings are desired, layer 12 *may* be softened slightly by heating, for example, to permit particles deposited *on* its surface to seat themselves . . . into the plastic after which additional particles may be cascaded across or dusted over the softenable layer 12." (Emphasis added.) Finally, an embodiment is described in which the agglomerable layer does not appear to be embedded in the softenable layer—agglomerable particles are dispersed in a binder, and the binder layer is "placed *on* a softenable layer or sandwiched between softenable layers to create an imaging member." (Emphasis added.)

We therefore hold that the rejection of claims 1–13, 17–26, and 31–33 for failing to define the agglomerable layer as embedded within the softenable layer was erroneous.

---

**6.** We note that no prior art was relied on by the PTO.

In view of the foregoing, the decision of the board is *reversed.*

REVERSED.