58 CCPA

**Application of Paul V. BROWER and John F. Fuzek.**

**Patent Appeal No. 8360.**

United States Court of Customs and Patent Appeals.

Nov. 25, 1970.

Donald E. Gillespie, Research Triangle Park, N. C., attorney of record, for appellant. Rudolph S. Bley, Elizabethton, Tenn., Ellsworth H. Mosher, Arlington, Va., Stevens, Davis, Miller & Mosher, Arlington, Va., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents, Fred W. Sherling, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals finally refusing to accord claims 1, 2, 9–12, 19 and 20 in appellants' application[1] the benefit of an earlier filing date under 35 U.S.C. § 120 and sustaining the rejection of those claims under 35 U.S.C. § 102 as unpatentable over an intervening

---

1. In re Ratti, 270 F.2d 810, 46 CCPA 976 (1959).

1. Serial No. 463,947, filed June 14, 1965, entitled "Process of Spinning Viscose."

patent to Howsmon, et al.[2] Ten claims in the application stand allowed.

## THE INVENTION

The claims at issue are directed to a process for producing viscose rayon fibers and other regenerated cellulosic products having improved dry strength. It appears from the record that such products are ordinarily made by first treating naturally-occurring cellulosic materials, such as wood pulp or cotton linters, with a caustic soda solution and carbon disulfide to form a thick, syrupy solution. This caustic solution, or viscose, is then extruded into the desired shape and the cellulose "regenerated" by directing the extruded material into an acid coagulating bath, most commonly containing sulfuric acid as well as certain salts such as zinc sulfate and sodium sulfate.[3] The process of the rejected claims involves incorporating into the viscose before the extrusion step a small quantity of low molecular weight polyalkylene glycol. Claims 1–2 and 11–12 recite the process of producing "improved cellulosic products" by "modifying a high maturity viscose" through the incorporation of the polyalkylene glycol. Claims 19–20 are drawn to a "high maturity viscose solution * * * containing * * * a polyalkylene glycol." Claims 9–10 recite a process for producing viscose rayon. Because of its particular pertinency in this appeal, we hereby reproduce claim 9 as representative of the claimed invention (paragraphing ours):

9. A process for the production of viscose rayon which comprises

preparing a spinning solution consisting essentially of viscose and from about 0.5% to 1% of a polyethylene glycol having an average molecular weight of about 400 to 7500,

and extruding while stretching the resultant viscose at a salt point of about 7.5 to 9 into an acid spin bath comprising sulfuric acid, sodium sulfate and from about 4% to 15% by weight of zinc sulfate,

said percentage of said polyethylene glycol being based on the cellulose content of the viscose, and said amount of said polyethylene glycol being sufficient to produce a regenerated cellulosic product having a substantially increased dry strength over that obtained without said polyethylene glycol, said dry strength being at least about 3.83 grams per denier.

## BACKGROUND

The record indicates that a number of claims in appellants' parent application, which defined subject matter essentially similar to that of claims 9 and 10 on appeal here, were allowed in that application as a result of appellants being awarded priority in an interference contest with the parent application of the Howsmon, et al. reference patent. After ex parte examination of the parent application had been re-instituted, the other claims therein (drawn to subject matter corresponding generally to that of claims 1, 2, 11, 12, 19 and 20 in the present case), were rejected by the examiner (on grounds not relevant here) as not being in compliance with 35 U.S.C. § 112. This rejection was brought before the Board of Appeals and was reversed on the specific grounds relied on by the examiner. However, the board then proceeded to apply to the claims a new ground of rejection based on section 112, which ground, it pointed out, was also applicable to those claims which previously had

---

2. U. S. Patent 3,182,107, issued May 4, 1965, on an application filed December 18, 1956, which in turn was a continuation-in-part of an application filed November 3, 1954.

3. Of course, the industrial process involves several other steps not critical to

our understanding of the invention. Of some pertinence here, however, is an ageing step, wherein the viscose "ripens" before it is extruded. Evidently the riper the viscose, the easier it coagulates. A commonly used measure of the degree of ripeness of the viscose is the "salt-point".

been allowed. The board's reasoning was as follows:

> our study of the specification has led us to conclude that appealed claims 33, 34, 41, and 42 are *too broad and fail to define appellants' invention properly* (35 U.S.C. 112) for an entirely different reason.
>
> Claims 33, 34, 41, and 42 specify only the polyalkylene glycol additive, whereas the other appealed claims require a water soluble viscose coagulant in addition to the polyalkylene glycol. *As we read appellants' specification, the use of these two additives in combination is essential to appellants' process and product,* and the use of the polyalkylene glycol *alone,* is not appellants' invention. [Emphasis ours.]

## THE PARENT APPLICATION

To appreciate the position taken by the board in that first appeal, one must consider the disclosure of the original specification. We believe that the tenor of that disclosure is readily indicated by the following statement taken from the initial paragraphs of the parent specification:

> According to the present invention, a method for preparing and spinning a modified viscose has been discovered which requires very few changes to existing spinning procedures. We have discovered that a so-called normal viscose (7.0% cellulose (wood pulp) and 6.0% alkali, for example) can be modified by the addition thereto of a small amount of a compound from the class of polyalkylene glycols, including derivatives and mixed polymers thereof, *in conjunction with* the addition of a water soluble salt of the type which would function as a coagulant for the viscose in an aqueous solution thereof. When viscose so modified is spun under the optimum conditions prescribed

a greatly improved product has been found to result.

> While the compounds which we prefer to employ from the above classes are not, each in themselves, new to the rayon art, it was completely unexpected that *their combined use* in the amounts indicated as additives to viscose would produce a yarn having the improved qualities found to exist. [Emphasis added.]

The rest of the disclosure text is similarly directed. Thus, later on it is stated:

> In more detail, my invention comprises the modification of a so-called normal viscose by the addition thereto of a polyalkylene glycol such as "Carbowax 4000", in an amount in excess of the normally accepted amounts required to prevent spinnerette incrustation, *together with* a water soluble salt such as sodium sulfide in an amount in excess of that normally produced as a by-product in the dexanthation and regeneration of the viscose when such "by-product" salts are selected for use. [Emphasis added.]

Illustrative examples are then provided of the "manner and mode of carrying out the present invention and the highly desirable improvements in the yarn properties which result from the addition of the additives to the viscose of the present invention prior to spinning." The first twelve of these examples disclose the use of *both* additives. Three additional working examples are then set out showing the preparation of a viscose with, respectively, no additives, the polyethylene glycol only, and sodium sulfide only.[4] Of particular interest is the opening sentence of example 14:

> To further illustrate the necessity of incorporating both additives to the viscose to achieve the improved results, a 7% cellulose, 6% caustic soda vis-

---

4. Assertions by the solicitor to the contrary notwithstanding, we think it indisputable that these examples teach that the addition of either additive gives some improvement over the properties demonstrated in the example in which nothing was added to the viscose.

cose was prepared employing 37% $CS_2$ with .25% Carbowax 4000 being added to the viscose at the time of mixing.

Finally, the concluding paragraphs of the disclosure contain the following statement:

It should be pointed out, however, that under the spinning conditions as set forth in the above examples, the salt plus the polymeric glycol are both required in the viscose to achieve high tenacity since only slight, if any, improvements in tenacity results from the addition of one or the other to the viscose under the spinning conditions prescribed herein, as will be observed by the previously set forth comparative examples.

## THE PRESENT APPLICATION

There is no dispute that the claims now on appeal fully satisfy the requirements of 35 U.S.C. § 112. Appellants have altered the language of their specification so that it now reflects their obvious intent to have the addition of the polyalkylene glycol alone regarded as the principal feature of their invention with the inclusion of the water soluble salt being preferred, but not necessary. For example, the new opening sentence of example 14 (the body of the example is unchanged) now reads:

To illustrate the substantially improved results obtained by the use of a polyalkylene glycol alone over the results obtained without the polyalkylene glycol, a 7% cellulose, 6% caustic soda viscose was prepared employing 37% $CS_2$ with .25% Carbowax 4000 being added to the viscose at the time of mixing.

However, because of the fact that the parent case had been held limited in its disclosure to the use in the process of a

viscose containing both additives and that the rejected claims in the parent case had been held "unduly broad" because of that limited disclosure, the examiner and the board determined that the claims in the present application were not entitled to the date of the parent case. The present claims were therefore rejected on the basis of the disclosure of the intervening patent issued to Howsmon, et al. on subject matter not included in the interference.

## OPINION

The single issue in the present appeal, as we see it, is simply whether appellants' parent application satisfies the requirements of 35 U.S.C. § 120 [5] so as to provide a basis for antedating the unquestionably anticipatory disclosure of the Howsmon, et al. patent. We believe that it does.

Our review of the complete disclosure of appellants' parent application as outlined *supra* has satisfied us that the board's rejection in that first case might have had some merit. The claims there rejected do, indeed, appear to have been "unduly broad." However, with the benefit of the enlightenment provided by our recent decisions in this area, it is now clear that those claims, if too broad, were so only in the sense that they encompassed *more* than appellants' manifestly regarded as their invention. Compare, In re Prater, 415 F.2d 1393, 56 CCPA 1381 (1969); In re Borkowski, 422 F.2d 904, 57 CCPA (1970). As such, they would be in clear contravention of the requirements of the *second* paragraph of section 112.

In this regard, it is imperative to note that section 120 *specifies* that the previously filed application, the filing date of which is to be accorded to subsequent

---

5. "An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

applications, must disclose the invention "in the manner provided by the *first* paragraph of section 112." (Emphasis ours). This means only that the invention *claimed* in the *subsequent* application must be *disclosed* in the *earlier* application "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."

Considering the disclosure of appellants' parent application in this light, we find that it contains an enabling disclosure of the invention now claimed. Granted, that disclosure indicates that at least the specific narrow invention of claims 9–10 is not a preferred one. Nevertheless, we have no doubt that the disclosure would still teach one having ordinary skill in this art how to make and use the claimed invention. Section 120 of the statute requires nothing more in this respect.

From our reading of the original disclosure in the parent case, we find it evident that appellants concluded that while either of the two viscose adjuvants improved the dry strength of the final product, the combination of the two together provided the quantitative enhancement of properties thought necessary to convince the Patent Office of the unobviousness of their contribution. It is also equally obvious, as noted by the solicitor at oral hearing, that the original broad claims were present in the case as a result of an attorney's desire to obtain the broadest possible protection for his client. It later on transpired that appellants had been too restrictive in their judgment of patentable merit. The Patent Office determined that not only the claims reciting *both* adjuvants but also those reciting polyalkylene glycol alone defined unobvious subject matter. In amending their disclosure to its present form in order to redirect the thrust of its teaching and pressing for allowance of the claims on appeal, appellants were merely attempting to obtain protection for what the Patent Office had already concluded was properly due them. We

find this to be perfectly in accord with the provisions of 35 U.S.C. § 120.

The decision of the Board of Appeals is reversed.

Reversed.