Application of John Paul HOGAN and Robert L. Banks.

Patent Appeal No. 76–641.

United States Court of Customs and Patent Appeals.

July 28, 1977.

E. Eugene Innis, Bartlesville, Okl., Young & Quigg, Washington, D. C., attys. of record, for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Fred E. McKelvey, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals affirming various rejections, under 35 U.S.C. §§ 102, 103, 112 (first paragraph), and 132, of claims 13–15 in appellants' application No. 181,185 filed September 16, 1971 (the 1971 application) for "Solid Polymers of Olefins."[1] A main issue involves use of a "later state of the art" as evidence to support a rejection.

The 1971 application is said to be a continuation of application No. 648,364 filed June 23, 1967 (the 1967 application), in turn a "divisional" of application No. 558,530 filed January 11, 1956 (the 1956 application)[2]. The 1956 application is a continuation-in-part of application No. 476,-306 filed December 20, 1954 and application No. 333,576 filed January 27, 1953 (the 1953 application).

We affirm in part, reverse in part, and remand with respect to certain rejections.

### The Claims

Although the 1971 application discloses several polymers, the claims are limited:[3]

13. A normally solid homopolymer of 4-methyl-1-pentene.[4]

---

1. The real party in interest is Phillips Petroleum Company.

2. The 1956 application is still pending. See note 3, infra.

3. At oral hearing, appellants' counsel stated that the 1956 application is involved in the "famous" polypropylene interference (see, e. g., *Standard Oil Co. v. Montedison, S.p.A.*, 540 F.2d 611 (CA3 1976)) and "when that case got into the district court, we gave up on our hope for a generic product claim and filed applications to each one of the several species [of polymers]."

4. 4-Methyl-1-pentene has a structural formula with carbon atoms numbered as follows:

$$\begin{array}{ccccc} 1 & 2 & 3 & 4 & 5 \\ CH_2 = CH - CH_2 - CH - CH_3 \\ & & & | \\ & & & CH_3 \end{array}$$

14. A polymer of claim 13 having a melting point in the range of 390 to 425°F.

15. A polymer of claim 13 which is wax-like and thermally stable as evidenced by substantially no decomposition at temperatures below about 700°F. as shown by Figure 5.[5]

### The Disclosures

Appellants assert that, under the provisions of 35 U.S.C. § 120,[6] claims 13 and 15 are entitled to the benefit of the filing date of the 1953 application and claim 14 is entitled to the benefit of the filing date of the 1956 application.

The 1953 application discloses solid polymers made from 1-olefin monomers having a maximum chain length of eight carbon atoms and no branching nearer the double bond than the 4-position. Several olefin monomers which form such polymers are disclosed: ethylene, propylene, 1-butene, 1-pentene, 1-hexene, and 4-methyl-1-pentene.

A method of making such polymers using a catalyst containing chromium oxide on a silica-alumina support is described. The application includes twenty "examples" and twenty-five "tables" giving detailed information on: how to prepare, activate, use, and regenerate the catalyst; how to influence the molecular weight of the polymer products; what solvents or diluents to use in admixture with the olefin feed; what feed velocities, reaction pressures, reaction temperatures, and reaction times are operative; and certain physical and chemical characteristics of the polymer products.

Example I in the 1953 application includes this statement, which we designate as [A]:

[A]

4-Methyl-1-pentene gave tough, solid polymer which, however, was successfully

expelled from the reactor in continuous-flow operation.

Example XVI refers to Figure 2 in the drawings, which is a graph showing thermal depolymerization curves for five polyolefin polymers and commercial polyisobutylene. Example XVI includes this statement, which we designate as [B]:

[B]

Whereas the former [commercial polyisobutylene] began to decompose at about 600°F, the latter (polymers of propylene, 1-butene, 1-pentene, 1-hexene, and 4-methyl-1-pentene) began to decompose at about 700–725°F.

Example XIX describes polymerizing 4-methyl-1-pentene "over chromia-alumina-silica catalyst" and states: "The 4-methyl-1-pentene polymer is a tough solid polymer suitable for a substitute for natural waxes."

The 1956 application is a continuation-in-part application and as filed contains most, but not all, of the information found in the 1953 application. Missing from the 1956 application as filed are statement [B] and the graph of Figure 2. Included in the 1956 application are the following new statements not present in the 1953 application, which we designate as [C] and [D]:

[C]

We have produced crystalline polymers of 4-methyl-1-pentene which have melting points in the range of 390 to 425°F.

[D]

1-Butene and 4-methyl-1-pentene can be polymerized in substantially the same manner as previously described and produce crystalline polymers. One sample of

---

5. "Figure 5" of the 1971 application is described infra.

6. § 120. Benefit of earlier filing date in the United States.

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor *shall have the same ef-*

*fect, as to such invention, as though filed on the date of the prior application,* if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. [Emphasis added.]

4-methyl-1-pentene polymer thus obtained had a melting point of 394° to 421°F. A second similar polymer of 4-methyl-1-pentene produced in the same general manner had a melting point of 410 to 420°F.

The 1967 application, according to appellants' brief before the board, contains all of the disclosures relating to polymers of 4-methyl-1-pentene contained in the 1953 and 1956 applications. The 1971 application on appeal contains statements [A] and [B], the Figure 2 graph (now Figure 5), and statements [C] and [D].

The following table summarizes the disclosures:

| Application (filing date) | Statement [A] | Statement [B] | Fig. 2 (now Fig. 5) | Statement [C] | Statement [D] |
|---|---|---|---|---|---|
| 1–27–53 | yes | yes | yes | no | no |
| 1–11–56 | yes | no | no | yes | yes |
| 6–23–67 | yes | yes | yes | yes | yes |
| 9–16–71 | yes | yes | yes | yes | yes |

### References

The references relied upon by the examiner and board were:

Haven 3,257,367 June 21, 1966 (filed June 23, 1955)

Edwards 3,299,022 January 17, 1967 (filed April 4, 1962)

Edwards 3,817,500 May 2, 1967 (filed October 2, 1963)

Natta et al., *Rendiconti dell'Accademia Nazionale dei Lincei*, Series VIII, Vol. XIX, No. 6 (December 1955), pp. 397–403.

Haven discloses a solid poly-4-methyl-1-pentene which is described as crystalline and, when oriented as a fiber, shows a melting point of 235°C. (455°F.).

Edwards ('022) describes a solid, amorphous, elastomeric homopolymer of 4-methyl-1-pentene. The patent states that a 1,4–type linkage[7] is almost exclusive, being over 95% of the repeating linkages in the homopolymer of 4-methyl-1-pentene, when polymerization using an aluminum chloride catalyst is conducted at temperatures below –60°C. The patent further states that "[i]t has been thought possible heretofore to obtain polymerization of olefins only through [1,2–type linkage]" and that a "structural copolymer" is obtained which contains structural units of the 1,2–type linkage as well as of the 1,4–type linkage, when polymerization is conducted at a higher temperature.

Edwards ('500) discloses a 1,4–type polymer of 4-methyl-1-pentene in a cross-linked form having a molecular weight in excess of 1,000,000.

Natta et al. (Natta) discloses a poly-4-methyl-1-pentene which is crystalline and which has a melting point of 205°C. (401°F.) as determined by X-ray examination.

### Rejections

The following rejections were affirmed by the board:

(1) Claims 13–15 under 35 U.S.C. § 112, first paragraph,[8] as "based on a non-enabling disclosure."

(2) Claim 14 under 35 U.S.C. § 112, first paragraph, as "based on a disclosure which does not teach how to prepare polymers having the claimed melting point range" of 390 to 425°F.

---

**7.** A reference to the number 1 carbon of one molecule of 4-methyl-1-pentene (note 4, supra) linking to the number 4 carbon of another molecule of 4-methyl-1-pentene.

**8.** § 112. Specification.

 The specification *shall contain a written description of the invention, and of the man-* *ner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art* to which it pertains, or with which it is most nearly connected, *to make and use the same* * * *. [Emphasis added.]

(3) Claim 14 under 35 U.S.C. § 132 as "containing new matter in the combination of 'homopolymer' and the melting point range of 390° to 425°F."

(4) Claims 13–15 under 35 U.S.C. § 102 as "fully met by Natta et al." (Natta).

(5) Claims 13 and 15 under 35 U.S.C. § 102 as "fully met by Haven."

(6) Claim 14 under 35 U.S.C. § 103 as "unpatentable over Haven."

## The Examiner's Answer

(1) With respect to the rejection of claims 13–15 under 35 U.S.C. § 112, first paragraph, as based on a non-enabling disclosure, the examiner stated:

This rejection is premised on the fact that while the claims are generic in nature, applicants have, at best, only described a very limited species within the generic class. It is believed that the scope of the enablement provided by this specification is not commensurate with the scope of the protection sought. *In re Moore*, [58 CCPA 1042, 439 F.2d 1232,] 169 USPQ 236 [(1971)].

* * * The disclosure * * * is non-enabling on how to prepare other species of this polymer such as those of Natta et al, Haven, Edwards (022) and Edwards (500) which, as far as this record is concerned, could not be prepared with the supported chromium oxide catalyst.

* * * The point is * * * that the claims are much broader than the polymers actually prepared in that about the only thing they have in common is that all are normally solid.

(2) With respect to the rejection of claim 14 under 35 U.S.C. § 112, first paragraph, as based on a disclosure which does not teach how to prepare polymers having the claimed melting point range of 390 to 425°F., the examiner stated that "[c]laim 14 reads on a single 'species' of polymer which begins to melt at 390°F and is completely melted at 425°F or on any species that melt

within this range." The examiner stated further that this rejection followed from a prior board decision (not of record) involving the 1967 application which held that the disclosure was non-enabling on how to make "a species" which had a melting point "of 410 to 420°F" (found in statement [D]). The examiner reasoned that the specification must also be non-enabling for "the only other 'species' which discloses a melting point, i.e., '394 to 421°F'" (found in statement [D]), and, therefore, "[i]f the only disclosure of polymers having certain melting points is non-enabling, the raw disclosure of polymers having even broader melting points could not possibly be enabling," referring apparently to statement [C].

(3) With respect to the rejection of claim 14 under 35 U.S.C. § 132 as containing new matter in the combination of "homopolymer"[9] with the melting point range of 390° to 425°F., the examiner explained that the only support for the temperature range appears in statement [C] and that the support for "homopolymers" presumably is derived from statement [D], but that the combination of these two limitations was created by amendment and, therefore, constituted new matter.

(4) With respect to the rejection of claims 13–15 under 35 U.S.C. § 102 as fully met by Natta, the examiner stated that appellants "agree" that the 4-methyl-1-pentene polymer of Natta "anticipates these claims" and that the "only issue" is whether Natta is "prior art to these claims."

Regarding claim 13, the examiner said that Natta is "a statutory bar" because nowhere in the 1971, 1967, or 1956 applications was there "an enabling disclosure" under 35 U.S.C. § 112, first paragraph, for the reasons cited above with respect to rejection (1). The examiner did not mention the 1953 application.

On claim 14, the examiner said that Natta "is prior art" for the reasons given for claim 13, for the additional reasons cited above with respect to rejections (2) and (3),

9. *The Condensed Chemical Dictionary* 448 (8th ed. 1971) defines "homopolymer" as "[a] polymer derived from a single monomer * * *."

and further because appellants' affidavit under 37 CFR 1.131 (Rule 131) "does not establish reduction to practice of this claim prior to December, 1955," which is Natta's publication date.

Regarding claim 15, the examiner said that Natta "is prior art" for the reasons given for claim 13 and that Natta is "a statutory bar" because the claimed subject matter is not disclosed in the 1956 application (i. e., statement [B] and the graph (now Figure 5) are not in that application).

(5) With respect to the rejection of claims 13 and 15 under 35 U.S.C. § 102 as fully met by Haven, the examiner stated that "[t]he Haven poly(4-methyl-1-pentene) would inherently possess the thermal stability properties of claim 15 in view of its high melting point" and that Haven is "a statutory bar to these claims" for the reasons given for Natta, above.

(6) With respect to the rejection of claim 14 under 35 U.S.C. § 103 as unpatentable over Haven, the examiner stated that the oriented fiber of Haven having a melting point of 235°C. (455°F.) would be expected to have a higher melting point than the unoriented polymer of appellants and, therefore, the range of 390 to 425°F. recited in claim 14 would have been obvious. The examiner said Haven is "prior art" on this claim for the reasons given for Natta, above. The examiner also said that appellants' Rule 131 affidavit does not antedate Haven because the affidavit "does not establish reduction to practice or even conception of the generic range 390–425°F."

### The Board

The board affirmed the rejections "for reasons essentially as given by the Examiner" which the board adopted as its own. The board then proceeded to add certain "comments for emphasis."

The board said that statement [C] "stands alone as a statement apparently unconnect-

ed with the preceding or following disclosure," and that "[i]t gives no clue as to how a polymer of 4-methyl-1-pentene having the recited range of melting points is to be prepared * * *." The board concluded that "[t]he disclosure is clearly non-enabling with respect to a teaching requisite to inform the artisan of how to make the claimed polymer."

The board further stated that the disclosure "is restricted to a teaching of how to make crystalline polymers," but that the claims are "not limited to a crystalline polymer of 4-methyl-1-pentene" but "encompasses an amorphous polymer as well, which is manifestly outside the scope of the enabling teaching present in the case."

The sole references to appellants' earlier applications, and to their Rule 131 affidavit, were contained in this paragraph:

> Inasmuch as we sustain the Examiner's rejections under 35 U.S.C. 112 and 132, appellants are palpably not entitled to the benefit of the filing dates of their parent cases which have essentially the same relevant disclosure as present herein; the Natta et al. article and Haven patent are thus statutory bars and an affidavit under Rule 131 becomes inappropriate. Consequently, we affirm the rejections of the appealed claims under 35 U.S.C. 102 as fully met by Natta et al. or Haven and do not reach nor decide the adequacy of the Rule 131 affidavit.

### Appellants' Contentions

Appellants contend that the board committed "serious error" in affirming the rejection of claims 13–15 under 35 U.S.C. § 112, first paragraph, as based on a non-enabling disclosure. Appellants argue that the board failed to recognize the "pioneer" status [10] of appellants' invention and that the adequacy of their application should be judged by the state of the art as of its filing date. Relying upon 35 U.S.C. § 120,

---

10. Their brief states: "The present specification describes a truly pioneer invention which is the *first* normally solid polymer of 4-methyl-1-pentene ever made." (Appellants' emphasis.) Whether appellants' invention is of "pioneer" status is not before us and bears no relation to our decision herein, though such status may influence the decision required on remand, as appears infra.

appellants assert the benefit of their January 27, 1953 filing date for claims 13 and 15 and their January 11, 1956 filing date for claim 14.

Appellants argue that the board erred in affirming the rejection of claim 14 under 35 U.S.C. § 112, first paragraph, because their disclosure leaves "no doubt" as to how to make the polymers recited in claim 14. Appellants refer to statement [C], statement [D], and to examples which give specific conditions suitable for making polymers of 4-methyl-1-pentene, and argue that § 112 does not require a specification to contain a specific working example in order to be enabling.

With respect to the rejection of claim 14 under 35 U.S.C. § 132 as containing new matter, appellants state that the board affirmed this rejection for the reasons given by the examiner, to wit, that the specification as originally filed does not support the combination of "homopolymer" with the recited melting point range because statement [C] includes copolymers and limiting that melting point range to homopolymers is "new matter." Appellants argue that the examiner and the board have considered statement [C] completely out of context with the rest of the specification.

Finally, appellants contend that claims 13 and 15 are entitled to the benefit of the filing date of the 1953 application which is prior to Natta and Haven, that claim 14 is entitled to the filing date of the 1956 application, which is less than one year subsequent to Natta and to the effective date of Haven, and that appellants' affidavit under Rule 131 shows prior completion of the invention of claim 14. Thus, appellants contend that claims 13 and 15 are free of the rejections under 35 U.S.C. § 102 by virtue of the 1953 filing date and that claim 14 is free of rejections under 35 U.S.C. §§ 102 and 103 because the Rule 131 affidavit removes Natta and Haven. Because the board declined to consider the adequacy of appellants' Rule 131 affidavit, appellants request that the case be remanded to the board for consideration of the affidavit if this court reverses the rejections under 35 U.S.C. §§ 112 and 132.

*The Solicitor*

The solicitor supports the examiner and the board and further argues that appellants' claims cover a genus of homopolymers of 4-methyl-1-pentene, including both low and high molecular weight homopolymers; that "at best" appellants teach how to make only low molecular weight homopolymers; that it is possible in view of Natta, Haven, Edwards ('022), and Edwards ('500) to produce homopolymers having high molecular weights; and, therefore, "the enabling disclosure in the specification is not commensurate in scope with the breadth of the claims." The solicitor points out that appellants' Rule 131 affidavit shows that they possessed certain molecular weight data (showing a molecular weight of 1,800 for a polymer of 4-methyl-1-pentene) prior to the filing date of their 1956 application, yet such data were not included in that application. Furthermore, the solicitor points to Edwards ('500) which discloses homopolymers of 4-methyl-1-pentene having molecular weights greater than 1,000,-000. Thus, the solicitor contends that the examiner and the board made out a prima facie case that appellants' enabling disclosure is not commensurate in scope with the claims.

In response to appellants' argument that their disclosure should be judged by the state of the art as of its effective filing date, the solicitor states:

The references relied upon by the examiner to demonstrate the shortcomings of appellants' disclosure all have dates prior to the filing date of this [1971] application. Hence, until appellants establish that their present specification is sufficient, there is no need to determine what disclosure might have been sufficient in 1953 and 1954 when appellants' grandparent applications were filed. [Bracketed matter added.]

On the rejection of claim 14 as containing new matter, the solicitor argues that appellants do not disclose, in their 1971 application as filed, any homopolymers having

melting points at the "outer limits" of the range 390 to 425°F. and that "the only melting points disclosed are for homopolymers in the range of 394 to 421° F. and 410 to 420° F."

With respect to the prior art rejections, the solicitor states:

> Consideration by the Court of the prior art rejections becomes necessary only if the lack of enablement rejection and new matter rejection are reversed. Since the Board had held that appellants' grandparent disclosures are essentially the same as the present disclosure with respect to claim 13 and 15, should the lack of enablement rejection and new matter rejection be reversed, the prior art rejections of claims 13 and 15 should also be reversed and the appeal should be remanded with respect to claim 14, because the Board did not rule on the sufficiency of the affidavit submitted by appellants under 37 CFR § 1.131 * * *.

## OPINION

### I. *Disregard of the Effect of 35 U.S.C. § 120*

The board premised the rejection of claims 13–15 under 35 U.S.C. § 112, first paragraph, on insufficient enablement in appellants' 1971 application, disregarding entirely the statutory right of appellants under 35 U.S.C. § 120. That was clear error.

That the board looked only to appellants' 1971 application is clear from its statement quoted above. Because it sustained the rejections under 35 U.S.C. §§ 112 and 132, the board said, "appellants are palpably not entitled to the benefit of the filing dates of their parent cases which have essentially the same relevant disclosure as present herein." The board did not specifically mention 35 U.S.C. § 120 and its action deprived appellants of their rights under that portion of the statute.

In apparent recognition of the nature of the board's action, the solicitor argues, as above indicated, that "there is no need to determine what disclosure might have been sufficient in 1953" until after appellants have established "that their present specification is sufficient." The complete answer, of course, is that one who can establish sufficiency of a 1971 disclosure *has no need* to establish sufficiency of a 1953 disclosure, and no need to exercise his right to the benefit of 35 U.S.C. § 120.

■ Fully applicable to appellants' right under 35 U.S.C. § 120 is this Supreme Court statement in *United States v. American Bell Telephone Co.,* 167 U.S. 224, 247, 17 S.Ct. 809, 813, 42 L.Ed. 144 (1897):

> A party seeking a right under the patents statutes may avail himself of all their provisions, and the courts may not deny him the benefit of a single one. These are questions not of natural but of purely statutory right.

The board's error in disregarding the effect of 35 U.S.C. § 120 is highlighted by the legislative and judicial background of the statutory provision, which extends over more than a century. The Reviser's Note states: "This section represents *present law* not expressed in the statute * * *." (Emphasis added.) P. J. Federico's *Commentary on The New Patent Act*, 35 U.S. C.A. p. 1, at p. 31 (1954), notes that the benefit provided by § 120 "was not specified in the old statute but was developed by decisions of the courts beginning with a decision of the Supreme Court of 1864, *Godfrey v. Eames,* 68 U.S. 317 [17 L.Ed. 684]." *Godfrey v. Eames* discusses the benefit accorded to the applicant in the following passage:

> In our judgment, if a party choose to withdraw his application for a patent, and pay the forfeit, intending at the time of such withdrawal to file a new petition, and he accordingly do so, the two petitions are to be considered parts of *the same transaction,* and both *as constituting one continuous application,* within the meaning of the law. [Emphasis added.] [68 U.S. at 325–26.] [11]

---

11. A requirement for copendency is now set forth in 35 U.S.C. § 120.

■ The Supreme Court's explanation illuminates the meaning of "shall have the same effect" and clearly requires that we view appellants' applications as "parts of the same transaction" and "as constituting one continuous application" for the continuing subject matter recited therein.

■ We held in *In re Glass*, 492 F.2d 1228, 1232 (CCPA 1974), that an applicant could not rely on what occurred in the art after his filing date because "application sufficiency under § 112, first paragraph, must be judged as of its filing date." [12] That principle applies equally to the PTO with respect to a continuing application entitled under § 120 to the benefit of an earlier filing date. No rational distinction can be made in the treatment accorded to the subject matter of an original application and to the same subject matter disclosed in a continuing application. Courts should not treat the same legal question, enablement under § 112, in one manner with respect to the applicant and in a different manner with respect to the examiner.

■ The examiner and the board, in support of the § 112 rejection, cited Natta, Haven, Edwards ('022), and Edwards ('500), not as *prior art*, but as *evidence* to prove appellants' disclosure non-enabling for "other species" of the claimed polymer, in an effort, as judicially required, to show why the scope of enablement was insufficient to support the claims. See, e. g., *In re Wertheim*, 541 F.2d 257, 263 (CCPA 1976); *In re Armbruster*, 512 F.2d 676 (CCPA 1975); *In re Dinh-Nguyen*, 492 F.2d 856, (CCPA 1974); *In re Marzocchi*, 439 F.2d 220, 58 CCPA 1069 (1971). As thus implicitly recognized, the references would not have been available in support of a 35 U.S.C. §§ 102 or 103 rejection entered in connection with the 1953 application. To permit use of the same references in support of the 35 U.S.C. § 112 rejection herein, however, is to render the "benefit" of 35 U.S.C. § 120 illusory.[13] The very purpose of reliance on § 120 is to reach back, to avoid the effect of intervening references. Nothing in § 120 limits its application to any specific grounds for rejection, or permits the examiner, denied use of references to reject or to require narrowing of a claim under §§ 102 or 103, to achieve the same result by use of the same references under § 112. Just as justice and reason require application of § 112 in the same manner to applicants and examiners, symmetry in the law, and evenness of its application, require that § 120 be held applicable to all bases for rejection, that its words "same effect" be given their full meaning and intent.

■ The clear and unambiguous language of § 120 states that "[a]n application * * * for an invention disclosed in the manner provided by the first paragraph of section 112 * * * in an application previously filed in the United States * * * *shall have the same effect, as to such invention, as though filed on the date of the prior application* * * *." (Emphasis added.) Thus, appellants' 1971 application should have been given "the same effect," i. e., it should have been tested for compliance with § 112, first paragraph, "as though filed on the date of the prior application," to wit, 1953 with respect to claims 13 and 15 [14] and 1956 with respect to claim 14.

■ Because the board did not consider appellants' ancestral applications in affirm-

---

12. Accord, *In re Gunn*, 537 F.2d 1123 (CCPA 1976); *In re Scarbrough*, 500 F.2d 560 (CCPA 1974).

13. It would also exalt form over substance. If the present appellants had not filed continuing applications, the only filing date involved would be that of the 1953 application. To judge the 1971 application in isolation would have a chilling effect upon the right of applicants to file continuations. The 24 years of pendency herein may be decried, but a limit upon continuing applications is a matter of policy for the Congress, not for us. See *In re Henriksen*, 399 F.2d 253, 262, 55 CCPA 1384, 1395 (1968). As presently constituted, the law as set forth in 35 U.S.C. §§ 112 and 120 is the same for all applications, whether of long or short pendency.

14. Appellants allege entitlement to the 1953 filing date for claim 15. As discussed infra, claim 15 is not entitled to either the 1953 or 1956 filing date.

ing the rejections under § 112, first paragraph, in view of the cited references, those rejections must be reversed and the case remanded to permit consideration of enablement questions as of the proper filing date.[15]

## II. Employment of a Later State of the Art in Testing For Compliance With 35 U.S.C. § 112, First Paragraph

The pendency since 1953 of appellants' applications, giving rise to concern over whether a claim may issue of breadth sufficient to encompass the later existing, "non-enabled" amorphous polymers of Edwards, and the PTO's application to the present facts of this court's statement in In re Moore, 439 F.2d 1232, 58 CCPA 1042 (1971) that "the scope of enablement" must be "commensurate with the scope of protection sought," impel clarification.

Citing Moore, the examiner stated that the § 112 rejection "is premised on the fact that while the claims are generic in nature, applicants have, at best, only described a very limited species within the generic class." Further, the examiner said "[t]he disclosure * * * is non-enabling on how to prepare other species of this [claimed] polymer such as those of [the four cited references] which, as far as this record is concerned, could not be prepared with the supported chromium oxide catalyst." The board, in adopting the examiner's reasoning, recognized that its primary basis was the Edwards polymer: "The claims on appeal, however, are not limited to a crystalline polymer * * * but encompasses

[sic] an amorphous polymer [of Edwards] as well which is manifestly outside the scope of the enabling teaching present in the case." Thus, amorphous polymers not having been, on this record, in existence in 1953, the examiner and the board focused on the later state of the art represented by the 1962 filing date of Edwards.[16]

■ A later state of the art is that state coming into existence after the filing date of an application. This court has approved use of later publications as evidence of the state of art existing on the filing date of an application.[17] That approval does not extend, however, to the use of a later (1967, Edwards) publication disclosing a later (1962) existing state of the art in testing an earlier (1953) application for compliance with § 112, first paragraph. The difference may be described as that between the permissible application of later knowledge about art-related facts existing on the filing date and the impermissible application of later knowledge about later art-related facts (here, amorphous polymers) which did not exist on the filing date. Thus, if appellants' 1953 application provided sufficient enablement, considering all available evidence (whenever that evidence became available) of the 1953 state of the art, i.e., of the condition of knowledge about all art-related facts existing in 1953, then the fact of that enablement was established for all time and a later change in the state of the art cannot change it.

Rejections under § 112, first paragraph, on the ground that the scope of enablement is not commensurate with the scope of the

15. It is immaterial under 35 U.S.C. § 120 that the subject matter of claim 13 was not specifically claimed in the 1953 application. In re Brower, 433 F.2d 813, 58 CCPA 724 (1970).

16. According to the examiner and the board, Natta and Haven disclosed the same species disclosed by appellants and were applied under 35 U.S.C. § 102 as statutory bars.

17. Where, for example, a later publication evidenced that, as of an application's filing date, undue experimentation would have been required, In re Corneil, 347 F.2d 563, 568, 52 CCPA 1718, 1724 (1965), or that a parameter absent from the claims was or was not critical, In re Rainer, 305 F.2d 505, 507 n.3, 49 CCPA

1243, 1246 n.3 (1962), or that a statement in the specification was inaccurate, In re Marzocchi, 439 F.2d 220, 223 n.4, 58 CCPA 1069, 1073 n.4 (1971), or that the invention was inoperative or lacked utility, In re Langer, 503 F.2d 1380, 1391 (CCPA 1974), or that a claim was indefinite, In re Glass, supra, 492 F.2d at 1232 n.6, 181 USPQ at 34 n.6, or that characteristics of prior art products were known, In re Wilson, 311 F.2d 266, 50 CCPA 773 (1962). Whatever may have been said enroute to decision in these cases, the fact situation in none of them established a precedent for permitting use of a later existing state of the art in determining enablement under 35 U.S.C. § 112.

claims, orbit about the more fundamental question: To what scope of protection is this applicant's particular contribution to the art entitled?

Though we do not reach the point on this appeal, we note appellants' argument that their invention is of "pioneer" status. The record reflects no citation of prior art disclosing a solid polymer of 4-methyl-1-pentene, which may suggest that appellants at least broke new ground in a broad sense. On remand, appellants may be found to have been in fact the first to conceive and reduce to practice "a solid polymer" as set forth in claim 13. As pioneers, if such they be, they would deserve broad claims to the broad concept. What were once referred to as "basic inventions" have led to "basic patents," which amounted to real incentives, not only to invention and its disclosure, but to its prompt, early disclosure. If later states of the art could be employed as a basis for rejection under 35 U.S.C. § 112, the opportunity for obtaining a basic patent upon early disclosure of pioneer inventions would be abolished.

The PTO has not challenged appellants' assertion that their 1953 application enabled those skilled in the art in 1953 to make and use "a solid polymer" as described in claim 13. Appellants disclosed, as the only then existing way to make such a polymer, a method of making the crystalline form. To now say that appellants should have disclosed in 1953 the amorphous form which on this record did not exist until 1962, would be to impose an impossible burden on inventors and thus on the patent system. There cannot, in an effective patent system, be such a burden placed on the right to broad claims. To restrict appellants to the crystalline form disclosed, under such circumstances, would be a poor way to stimulate invention, and particularly to encourage its early disclosure. To demand such restriction is merely to state a policy against broad protection for pioneer inventions, a policy both shortsighted and unsound from the standpoint of promoting progress in the useful arts, the constitutional purpose of the patent laws. See *In re Goffe*, 542 F.2d 564, (CCPA 1976).

In *In re Fisher*, 427 F.2d 833, 839, 57 CCPA 1099, 1108 (1970), this court set forth the basic considerations respecting enablement and the potential for domination of future developments, describing the effect of predictability factors upon those considerations. We adhere to what was there said concerning the high level of predictability in mechanical or electrical environments and the lower level of predictability expected in chemical reactions and physiological activity. With respect to the erroneous use of a later state of the art in determining enablement, however, we make no distinction between fields of invention.

Consideration of a later existing state of the art in testing for compliance with § 112, first paragraph, would not only preclude the grant of broad claims, but would wreak havoc in other ways as well. The use of a subsequently-existing improvement to show lack of enablement in an earlier-filed application on the basic invention would preclude issuance of a patent to the inventor of the thing improved, and in the case of issued patents, would invalidate all claims (even some "picture claims") therein. Patents are and should be granted to later inventors upon unobvious improvements. Indeed, encouragement of improvements on prior inventions is a major contribution of the patent system and the vast majority of patents are issued on improvements. It is quite another thing, however, to utilize the patenting or publication of later existing improvements to "reach back" and preclude or invalidate a patent on the underlying invention.

If applications were to be tested for enablement under § 112 in the light of a later existing state of the art, the question would arise over how much later. An examiner could never safely call a halt and pass an application to issue. One who had slavishly copied the disclosed and claimed invention of a patent issued in 1965, for example, could resist an infringement action by insisting that a court hold the patent invalid because it was not enabling with respect to some third product which first came into

existence, and thus came within the purview of the claim, in 1975.

The PTO position, that claim 13 is of sufficient breadth to cover the later state of the art (amorphous polymers) shown in the "references," reflects a concern that allowance of claim 13 might lead to enforcement efforts against the later developers. Any such conjecture, if it exists, is both irrelevant and unwarranted. The business of the PTO is patentability, not infringement. Like the judicially-developed doctrine of equivalents, designed to protect the patentee with respect to later-developed variations of the claimed invention,[18] the judicially-developed "reverse doctrine of equivalents," requiring interpretation of claims in light of the specification,[19] may be safely relied upon to preclude *improper* enforcement against later developers. The courts have consistently considered subsequently existing states of the art as raising questions of infringement, but never of validity. It is, of course, a major and infinitely important function of the PTO to insure that those skilled in the art are enabled, as of the filing date, to practice the invention claimed. If, in the light of all proper evidence, the invention claimed be clearly enabled as of *that* date, the inquiry under § 112, first paragraph, is at an end.

### III. The Rejections of Claim 13 Under 35 U.S.C. § 102

■ The filing date of appellants' 1953 application precedes Natta's publication date (December, 1955) by almost three years and it precedes Haven's effective date (June 23, 1955) as a prior art reference under 35 U.S.C. § 102(e) by more than two years.

Therefore, if claim 13 is entitled to the benefit of the 1953 filing date, Natta and Haven are not prior art references against claim 13 and the rejections under § 102 must fall. Because these rejections depend upon the same issue as that stated above

for the § 112 rejection of claim 13, they are also reversed and the case is remanded to the PTO for consideration of the correct issue.

### IV. The Rejections of Claim 14

#### A. The First Rejection Under 35 U.S.C. § 112, First Paragraph

Claim 14 is not entitled to any date earlier than the 1956 filing date because, as appellants acknowledge, the disclosure to support claim 14 first appeared in the 1956 application. Each application since 1956 has contained the same basic disclosure with respect to claim 14.

What was said above, respecting the rejection of claim 13 under 35 U.S.C. § 112, first paragraph, is equally applicable to this rejection of claim 14, except for substitution of the *1956* filing date for the 1953 filing date, and, as indicated, this rejection of claim 14 is reversed and the case is remanded to the PTO for consideration of the correct issue.

#### B. The Second Rejection Under 35 U.S.C. § 112, First Paragraph

■ The second rejection of claim 14 under 35 U.S.C. § 112, first paragraph, does not involve appellants' entitlement to an earlier filing date or the availability of any reference. It rests on the ground that the "disclosure does not teach how to prepare polymers having the claimed melting point range [390° to 425°F]."

Statement [C] teaches that appellants "have produced crystalline polymers of 4-methyl-1-pentene which have melting points in the range of 390 to 425°F." and statement [D] teaches that "4-methyl-1-pentene can be polymerized in substantially the same manner *as previously described* [to] produce crystalline polymers." (Emphasis added.) The "previously described" examples and technical information in the application give many details on how to make

---

18. See *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

19. See *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568–69, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

olefin polymers using a chromium oxide catalyst.

The examiner based this rejection on a prior board decision without explaining why the disclosure does not teach how to make the claimed invention.[20] The present board commented that statement [C] "stands alone," is "unconnected," and that it gives "no clue" on how to make the claimed polymer.

The grounds advanced by the examiner and the board lack merit. Statement [C] does not "stand alone" and it is not "unconnected." Statement [C] must be read in light of the rest of the specification and it is clearly "connected," or related, to statement [D]. Statement [D] in turn is clearly connected to the detailed technical information on how to make olefin polymers. Neither the accuracy nor the sufficiency of *that* technical information has been questioned in this rejection. Thus, the examiner and the board effectively ignored statement [D] and the rest of the disclosure. This was error because the specification disclosure *as a whole* must be considered. *In re Moore,* supra.

The PTO not having carried its burden of establishing lack of enablement, this rejection of claim 14 under § 112, first paragraph, is reversed.

## C. The Rejection Under 35 U.S.C. § 132

Claim 14 was also rejected under 35 U.S.C. § 132, because "the combination of 'homopolymer' and the melting point range of 390° to 425°F." was considered "new matter" added by amendment to the 1971 application.

 A new matter rejection under 35 U.S.C. § 132, predicated on claim language, is tantamount to a rejection for lack of a written description of the claimed invention under 35 U.S.C. § 112, first paragraph. *In re Bowen,* 492 F.2d 859, 864 (CCPA 1974); *In re Smythe,* 480 F.2d 1376, 1385 (CCPA 1973). This court has held that

claimed subject matter need not be described in haec verba in the application to satisfy the written-description-of-the-invention requirement. *In re Smith,* 481 F.2d 910, 914 (CCPA 1973).

Statement [C] teaches that appellants "have produced crystalline polymers of 4-methyl-1-pentene which have melting points in the range of 390 to 425°F." One skilled in the art reading statement [C] would reasonably conclude that "polymers of 4-methyl-1-pentene" describes homopolymers (note 8, supra) of 4-methyl-1-pentene because that is the "necessary and only reasonable construction" to be given this statement. *Vogel v. Jones,* 486 F.2d 1068, 1075 (CCPA 1973); *Binstead v. Littmann,* 242 F.2d 766, 770, 44 CCPA 839, 844 (1957). If *copolymers* were being described, the sentence would refer to 4-methyl-1-pentene *and some other monomer.*

Accordingly, the rejection of claim 14 under 35 U.S.C. § 132 is reversed.

## D. The Rejections Under 35 U.S.C. §§ 102 and 103

 These prior art rejections of claim 14 depend upon the availability as prior art of Natta and Haven. Because the PTO did not test for compliance with the first paragraph of § 112 as of the 1956 filing date, using the state of the art as of that date, the rejections of claim 14 under 35 U.S.C. §§ 102 and 103 are reversed and we remand to the PTO so that the issue may be properly considered.

The filing date of appellants' 1956 application is *subsequent* to Natta's publication date (December, 1955) and to Haven's effective date (June 23, 1955). Therefore, if claim 14 is found on remand to be entitled to the benefit of the 1956 filing date, Natta and Haven would be available as prior art and the PTO should consider the adequacy of appellants' affidavit under 37 CFR 1.131 (Rule 131).

---

**20.** The examiner's answer did not base the rejection on the ground that claim 14 is limited to "a single 'species' of polymer which begins to melt at 390°F and is completely melted at 425°F." The examiner interpreted claim 14 as reciting this "species" *or* "any species that melt within its range."

Appellants have never contended that Natta's polymer was not the same as theirs. To the contrary, throughout the prosecution history and before this court, appellants have maintained that Natta's polymer and their polymer are substantially identical. Therefore, if on remand claim 14 is found not to be entitled to the benefit of the 1956 filing date, Natta is a statutory bar to claim 14. *In re Foster*, 343 F.2d 980, 52 CCPA 1808 (1965), *cert. denied*, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307 (1966).

## V. *The Rejections of Claim 15*

Claim 15 presents a situation different from that of claims 13 and 14 because, as appellants acknowledge, the disclosure to support claim 15 appears in the 1953 and the 1967 applications, but not in the 1956 application. Specifically, statement [B] and the Figure 2 graph showing the thermal depolymerization curves (Figure 5 in the 1972 application and referred to in claim 15) are not found in the 1956 application.

Thus, with respect to the subject matter of claim 15, there is a clear gap in the continuity of disclosure necessary to secure the benefit of § 120. As we stated in *In re Schneider*, 481 F.2d 1350, 1356 (CCPA 1973):

> [T]here has to be a continuous chain of copending applications each of which satisfies the requirements of § 112 with respect to the subject matter presently claimed. See *In re deSeversky*, 474 F.2d 671 (CCPA 1973). There must be continuing disclosure through the chain of applications, without hiatus, to ultimately secure the benefit of the earliest filing date.

Accord, *In re Goodman*, 476 F.2d 1365 (CCPA 1973).

Therefore, under § 120, claim 15 is entitled only to the benefit of the 1967 filing date,[21] and Natta is a statutory bar with respect to claim 15. *In re Foster, supra.* The rejection of claim 15 under 35 U.S.C. § 102, as anticipated by Natta, is therefore affirmed and the rejections of claim 15 un-

der 35 U.S.C. § 112, first paragraph, and under 35 U.S.C. § 102 as fully met by Haven, are moot.

### *Summary*

(1) The rejections of claims 13 and 14 are *reversed.*

(2) The rejection of claim 15 under 35 U.S.C. § 102 on Natta is *affirmed.* The remaining rejections of claim 15 are moot.

(3) The case is *remanded* for consideration of whether appellants' 1953 application was enabling with respect to claim 13 in view of the state of the art existing in 1953; whether appellants' 1956 application was enabling with respect to claim 14 in view of the state of the art existing in 1956, and, if so, whether appellants' affidavit under 37 CFR 1.131 was adequate to overcome Natta and Haven as references.

*MODIFIED AND REMANDED.*

MILLER, Judge, concurring in part.

I join the majority with respect to claim 15. However, I can only concur in the result reached by the majority with respect to claims 13 and 14.

The majority opinion properly holds that the board erred in considering the *later state of the art* in testing for compliance with the enablement requirement of 35 U.S.C. § 112, paragraph 1. However, in discussing this issue, it states:

> The pendency since 1953 of appellants' applications, giving rise to concern over whether a claim may issue of breadth sufficient to encompass the later existing, "non-enabled" amorphous polymers of Edwards, . . . impel[s] clarification.

It then "clarifies" the matter by stating:

> The PTO has not challenged appellants' assertion that their 1953 application enabled those skilled in the art in 1953 to make and use "a solid polymer" as described in claim 13. Appellants disclosed, as the only then existing way to make

---

21. We refrain from comment on appellants' hypothetical argument that the 1956 application could be amended to add the material in the 1953 application.

such a polymer, a method of making the crystalline form. . . . To restrict appellants to the crystalline form disclosed, under such circumstances, would be a poor way to stimulate invention . . . . To demand such restriction is merely to state a policy against broad protection for pioneer inventions . . . .

Absent evidence to the contrary, the language in a patent application is to be interpreted as it would have been at the time the application was filed. Although the PTO may rely on later art, it must show that the language used in that art would have meant the same to one skilled in the art at the time the patent application was filed. As this court stated in *In re Voss*, 557 F.2d 812, 819 n.15 (CCPA 1977):

[I]t is clear from the quotation from *In re Fisher*, 427 F.2d 833, 838, 57 CCPA 1099, 1106, 166 USPQ 18, 23 (1970), set forth in [footnote 6 of *In re Glass*, 492 F.2d 1228, 1232 (CCPA 1974),] that the PTO can rely on such later-issued patents and publications only if a showing is made that such claim language is the "language of the present art" as of the filing date of the application in question.

The majority opinion, in extended dicta, relies on *In re Goffe*, 542 F.2d 564 (CCPA 1976), for the proposition that restricting the claims to the crystalline form, preventing broad protection for a "pioneer" invention, would be "a policy both shortsighted and unsound from the standpoint of promoting progress in the useful arts . . . ." However, the facts before us are clearly different from those in *Goffe*. There, the claim language, well defined in the prior art, clearly delineated the "outer boundaries" of the claimed subject matter, and the question was whether there was enablement for every embodiment within the scope of the claims. Here, the question is: *in light of the interpretation of the claim language at the time the patent application was filed,* what are the "outer boundaries" of the claims? Thus, *Goffe* is inapposite.

Contrary to the majority opinion, to permit the "outer boundaries" of a claim to be construed in light of later art, rather than in light of art at the time the patent application was filed, could well *impede* progress in the useful arts. For example, it would relegate a later species invention (*e. g.*, the solid amorphous homopolymer of Edwards) to a subservient position vis-à-vis an earlier species invention (*e. g.*, the solid crystalline homopolymer disclosed by appellants), even though the earlier inventor did not contemplate, much less enable, a generic invention, merely because the patent application for the earlier invention used a *broad* term which, at the time, had a meaning to one skilled in the art that was coextensive with the species.

The majority opinion notes that the PTO's arguments evidence a concern that allowance of claim 13 might lead to enforcement efforts against later developers, but states that any conjecture on this point is "both irrelevant and unwarranted," since "[t]he business of the PTO is patentability, not infringement", and "the judicially-developed 'reverse doctrine of equivalents,' requiring interpretation of claims in light of the specification, may be safely relied upon to preclude *improper* enforcement against later developers." (Emphasis in original. Footnote omitted.) Two comments seem appropriate. First, in saying that "[t]o restrict appellants to the crystalline form disclosed, under such circumstances, would be a poor way to stimulate invention," the majority opinion advocates a double standard: for the inventor, interpret the language of the claims against later developers in light of the later state of the art; but for the PTO, as held here, interpret such language against the inventor only in light of the state of the art at the time the application was filed. I do not agree that such a double standard is needed to spur invention. Second, the PTO, in managing its business of *patentability*, has a duty to construe the scope of the claims, to interpret the claim language in light of the specification and the art existing at the time the patent application was filed, and to determine whether the scope of enablement is commensurate with the scope of the claims. If,

on remand, the PTO should determine that, at the time appellants' application was filed, one skilled in the art would have interpreted the phrase "solid homopolymer" broadly to include both crystalline and amorphous homopolymers, the PTO could, nevertheless, find that appellants' disclosure was only enabling to make a crystalline homopolymer and could properly reject claims 13 and 14 under the first paragraph of 35 U.S.C. § 112 as of broader scope than the scope of enablement. On the other hand, if the PTO should determine that, at the time appellants' application was filed, one skilled in the art would have interpreted the phrase "solid homopolymer" to include only a crystalline homopolymer, a finding of enablement, at the time appellants' application was filed, to make a crystalline homopolymer would end the inquiry under § 112, first paragraph.